# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, et al., | Lead Case No. CV 19–56–M–DWM |
| Plaintiffs, | |
| and | Member Case No. CV 19–60–M–DWM |
| SWAN VIEW COALITION, et al., | |
| Consolidated Plaintiffs, | OPINION & ORDER |
| vs. | |
| KURTIS E. STEELE, et al., | |
| Defendants, | |
| and | |
| DAVID BERNHARDT, et al., | |
| Consolidated Defendants, | |
| and | |
| MONTANA LOGGING ASSOCIATION and AMERICAN FOREST RESOURCE COUNCIL, | |
| Defendant-Intervenors. | |

## INTRODUCTION

In these consolidated cases, Plaintiffs are environmental organizations that

1

challenge decisions by the United States Forest Service and the United States Fish and Wildlife Service (collectively "Federal Defendants") concerning the Revised Forest Plan for the Flathead National Forest. Plaintiffs allege violations of the Travel Management Rule and related Executive Orders. (Doc. 75 at ¶ 256.)[1] Plaintiffs also claim that the Federal Defendants violated the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA") by issuing and relying on the 2017 Biological Opinion ("2017 BiOp"). (*Id.* at ¶¶ 277, 279.) The Montana Logging Association and the American Forest Resource Council (collectively "Defendant-Intervenors") intervened. Currently pending are the parties' cross-motions for summary judgment. (Docs. 76, 86, 90.) Plaintiffs' motion for summary judgment is granted on the limited grounds set forth below. In all other respects, summary judgment is granted in favor of Federal Defendants and Defendant-Intervenors.

## BACKGROUND[2]

### I.    Flathead National Forest

The Flathead National Forest is cradled in the Rocky Mountains of

---

[1] Record citations are to the lead case, CV 19–56–M–DWM, unless otherwise noted.

[2] This case involves two administrative records: the Forest Service administrative record, cited as "FS-[bates page #]", and the Fish and Wildlife Service administrative record, cited as "FWS-[bates page #]." All facts are undisputed unless otherwise indicated. (*See* Docs. 78, 88, 89, 92, 93, 98, 99.)

2

northwestern Montana, where its 2.4 million acres of public lands stretch between Glacier National Park and British Columbia. FS-054717. The Forest is home to a vast array of aquatic and wildlife species. At the same time, the Forest "has long been the center of a forest products industry" that supports logging and milling, and the Forest is widely used for social and recreational endeavors. FS-054718.

Relevant here, the Forest supports populations of and habitats for grizzly bears and bull trout; both are discussed below.

## A. Grizzly Bears

This case concerns the population of grizzlies living in the Northern Continental Divide Ecosystem ("NCDE"), one of six grizzly bear ecosystems in the continental United States. FS-051889. The NCDE population acts as a source for genetic diversity for other grizzly populations within the United States. FWS-002002. Grizzly bears, including those in the NCDE, remain a "threatened species" under the ESA. FWS-001984–85.

Road management poses one of the greatest threats to grizzly bears and their habitats. FWS-002028. Roads increase the likelihood of collision with a vehicle, illegal harvesting, and access to humans; risk bear displacement and avoidance of roads and road activity; and modify or fragment core grizzly habitat. FWS-002028. Additionally, roads may disrupt breeding behaviors by discouraging female bears to travel, feed, or shelter in high-density road areas. FWS-002066.

Relatedly, winter motorized travel poses another significant threat to grizzlies and their habitat. *See* FS-070901. Specifically, snowmobiles may cause den emergence disruption, FWS-002008, loss of young, FS-112043, and avoidance of den-suitable habitat, FWS-002056.

### B. Bull Trout

Bull trout are a threatened species under the ESA, FWS-001860, and the Forest includes 12 bull trout core areas of the Columbia Headwaters Recovery Unit, FWS-001865. Bull trout require specific conditions to live and spawn, such as cold, clean water through which the trout can migrate. FWS-001899. Because bull trout require such specific habitat conditions, they are particularly susceptible to habitat loss, fragmentation, and degradation. FWS-001894. Activities that disrupt riparian vegetation, such as logging, can increase soil moisture and surface runoff, which may adversely impact bull trout habitat. FWS-001931–32. Additionally, roads and traffic in areas around bull trout habitat have the potential to contribute to sediment delivery, FWS-001935, which adversely affects water quality and temperature, FWS-001936.

Relatedly, culverts are structures that allow water to flow under a road from one side to the other, FS-083966, and they represent another threat to bull trout and their habitat in the Forest, *see* FWS-030236–37. Though the parties here dispute the inevitability of culvert "failure," (*see* Doc. 93 at ¶ 53), it is undisputed that

culverts can trap debris and contribute to sedimentation of streams, which in turn

can have adverse effects on water quality and water temperature, FWS-030236–37.

## II.     Historic Management of the Forest

Forest plans govern the management of national forests, FS-051881, and the

National Forest Management Act requires revision of Forest Plans at least every

fifteen years, 16 U.S.C. § 1604(f)(5)(A).  Until 2018, when the Revised Plan at

issue was adopted, the Forest was managed under the 1986 Forest Plan, which was

regularly amended and updated with pertinent information from Federal

Defendants.  FS-054719.  Relevant to the development of the Revised Plan are

Amendments 19 and 24 to the 1986 Forest Plan, and the Fish and Wildlife

Service's 2017 BiOp.

### A.     Amendment 19

Amendment 19 was adopted in the 1995 Record of Decision ("ROD") and

provided objectives for motorized use and route density within bear management

units inside the Forest.  FS-002015.  Pursuant to Amendment 19, in bear

management units in which the Forest Service managed at least 75 percent of the

land, there would be no net increase in total motorized route density greater than 2

miles per square mile, no net increase in open motorized route density greater than

1 mile per square mile, and no net decrease in the amount of security core area.

FS-002015.  Amendment 19 also established management directives "reduc[ing]

impacts of forest management activities on grizzly bears (especially females) by adopting [certain directives] for subunits where the [Forest Service] managed more than 75 percent of the acres in a subunit." FS-002015. These directives included: (1) limiting high-density open road motorized access (meaning more than one mile per square mile) to no more than 19% per subunit by 1999; (2) limiting high-density total motorized route access (meaning more than two miles per square mile) to no more than 19% of a subunit by 1999; and (3) providing security core areas that equaled or exceeded 60% of each subunit by 1999 and that equal or exceeded 68% by 2005. FS-042259. These ratios are referred to as "19-19-68." (*See* Doc. 87 at 11.) Although enacted with the aim of protecting grizzlies, Amendment 19 indirectly affected bull trout; fewer roads resulted in fewer road crossings and culverts, which in turn decreased sedimentation in bull trout habitat. FWS-001627.

While the parties dispute the extent to which Amendment 19's route density standards required the Forest Service to reclaim existing roads in affected subunits and to compensate for any new road construction by reclaiming other existing roads, (Doc. 93 at ¶ 56), the text of Amendment 19 requires that "Forest Service actions will result in a net gain towards the objectives on National Forest System lands." FS-042259. Further, it is undisputed that the Forest never met the 19-19-68 objectives and standards of Amendment 19. FS-054747; (*see also* Doc. 93 at

6

¶ 57). To meet the objectives of Amendment 19, approximately 518 miles of existing roads would need to be decommissioned. FS-054747.

## B.    Amendment 24

In 2006, the Flathead National Forest designated 787,000 acres and 3,000 miles of roads and trails for over-snow vehicle use. FS-110265. The designations were later implemented through Amendment 24 to the 1986 Forest Plan, the Forest's then-governing land management plan. FS-110254. The Revised Plan incorporates Amendment 24's previous over-snow vehicle use designations under the Over-Snow Vehicle Rule's grandfather provision. FS- 54762. It also identifies 567 additional acres as suitable for over-snow vehicle use, but it does not designate any site-specific planning for that acreage. FS-54762.

## C.    2015 Bull Trout Recovery Plan

In 2015, the Fish and Wildlife Service issued a "Recovery Plan for the Coterminous United States Population of Bull Trout" ("the Recovery Plan") on the effects to bull trout and their critical habitat from the implementation of proposed action associated with road-related activities, FS-016973–7167, and the Fish and Wildlife Service issued a 2015 BiOp for Bull Trout, *see* FS-174182. Most relevant here, the Recovery Plan and 2015 Bull Trout BiOp established annual requirements for culvert monitoring to identify and remove problem culverts before they failed to preempt stream sedimentation threats. FS-174226–67.

Appendix A and Appendix E of the 2015 BiOp worked in conjunction to guide the method and manner of the Forest Service's inspection, *see* FS-174247, 174273, and Appendix E required the Forest Service to annually inspect all culverts remaining in bull trout habitat that were closed by gate or "guardrail, concrete, earth barrier, or contour at intersection," and, in certain instances, to inspect culverts that are closed by boulders, FS-174280, 174820.

## III.  Procedural History

In 2015, the Forest Service announced its intention to revise the 1986 Plan pursuant to its 2012 Forest Planning Rules.  FS-044923.  In response, Plaintiffs submitted comments related to the Forest Service's statement of intent to prepare a draft Environmental Impact Statement ("EIS").  FS-083855, 087455, 094993. Once the Forest Service published its draft EIS for the Revised Plan, Plaintiffs timely submitted comments, FS-070673, 071804, 073636, and when the Forest Service published its draft ROD for the Revised Plan, Plaintiffs timely objected, FS-056011, 056355, 055826.

Upon responding to the eligible objections, FS-045641–43, the Forest Service reviewing office instructed the Forest Service to undertake additional analysis before issuing the Final ROD, FS-045753–55.  Three months later, the Forest Service completed the final EIS for the Revised Plan.  FS-052283.  Then-Forest Supervisor Chip Weber signed the final ROD on December 24, 2018, FS-

054711–76, and the Forest Service published a notice in the Federal Register, *see* 83 Fed. Reg. 66,673 (Dec. 27, 2018).

In 2017, the Fish and Wildlife Service completed its biological assessment of the Forest, FWS-001332, and concluded that the Revised Plan was likely to adversely affect bull trout and designated bull trout critical habitat, grizzly bear, Canada lynx, and Canada lynx critical habitat, FWS-001341–42. In November 2017, the Fish and Wildlife Service issued its 2017 BiOp, FWS-001855, which concluded that the Revised Plan was unlikely to jeopardize the threatened or endangered species above, nor was it likely to adversely modify their critical habitat, FWS-001957–60, 002058–63, 002166–73.

Plaintiffs filed suit in April 2019. Collectively, Plaintiffs raise the following claims: (1) a NEPA violation based on road density; (2) a NEPA violation based on culverts; (3) ESA violations based on road density and reclamation requirements, the relevant grizzly population, access conditions, winterized motor travel, take statements, and reliance on the allegedly flawed BiOp; and (4) violations of the Travel Management Rule. Cross-motions for summary judgment have been filed, (Docs. 76, 86, 90), and the Court heard oral argument on May 27, 2021, (*see* Doc. 115 (Min. Entry).) The matter is now ripe for adjudication.

## SUMMARY CONCLUSION

Though complicated by Plaintiffs' numerous yet discrete claims, this does

9

not appear to be a case in which the agencies cut corners. Rather, with limited

exception, the record reflects that Federal Defendants met their statutory

obligations in planning for and implementing the Revised Plan. But Plaintiffs do

succeed on several aspects of their ESA claims, which are discussed in more detail

below. Ultimately, because of the nature of the agencies' errors, remand without

vacatur is the appropriate remedy.

**LEGAL STANDARDS**

The Administrative Procedures Act ("APA"), 5 U.S.C. §§ 706 *et seq.*,

governs judicial review of agency actions under NEPA and the ESA. *See San Luis*

*& Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under

the APA, the "reviewing court shall . . . hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The

review is deferential to the agency, and a court should "not [] substitute its

judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A decision is arbitrary and capricious "only if the agency relied on factors

Congress did not intend it to consider, entirely failed to consider an important

aspect of the problem, or offered an explanation that runs counter to the evidence

before the agency." *Id.* A decision is also arbitrary and capricious if it "is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* On the other hand, an agency's action is valid if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* Disagreement with the agency's determinations, while expected, is *not* a reason to overturn the agency's determinations if the agency has acted in accordance with the substantive and procedural mandates of the questioned law. Consistent with the court's obligation not to substitute its judgment for that of the agency, an agency's action may only be upheld on "the basis articulated by the agency itself," and the agency must make plain its course of inquiry, analysis, and reasoning. *Id.* at 50.

## ANALYSIS[3]

Plaintiffs prevail on a handful of their claims related to the ESA. Specifically, Plaintiffs succeed on their ESA claims related to grizzly bears: that the Revised Plan is arbitrary and capricious to the extent it did not consider the impacts of its departure from Amendment 19's road density and reclamation standards, did not consider the impact on the entire grizzly population, did not adequately explain the adoption of the 2011 access conditions, and adopted a flawed surrogate in its take statement concerning grizzly bears. Plaintiffs also

---

[3] In this consolidated action, various claims were brought by various plaintiffs. To avoid confusion, the sponsoring plaintiff is identified only in the headings for each section; the general term "Plaintiffs" is used in the substantive discussion.

succeed on the narrow argument that departing from Amendment 19's culvert removal requirements violated the ESA as it relates to bull trout. Plaintiffs also succeed on their ESA claim that the Forest Service improperly relied on the flawed aspects of the 2017 BiOp. However, Plaintiffs fail on their remaining ESA claims, as well as on their NEPA and Travel Management Rule claims. The NEPA claims are discussed first, followed by the ESA claims, and then the Travel Management Rule claim.

## I.     NEPA Claims (Swan View Coalition Claims III and IV)

Under NEPA, federal agencies must follow systemic procedures when contemplating actions that will have an environmental impact. 42 U.S.C. § 4332. Consequently, agencies must consider alternatives to the proposed action— including no action—and compare those alternatives against the proposed action. 40 C.F.R. § 1502.14. This comparison and other NEPA considerations are included in an EIS. *Id.* § 1502.1. "An EIS is sufficient so long as it presents a full and fair discussion of significant environmental impacts and [] inform[s] decision makers and the public of reasonable alternatives that would minimize adverse impacts." *Id.* Forest plan revisions require the federal agency to prepare an EIS. 36 C.F.R. § 219.7(c)(1).

"NEPA's 'hard look' obligation requires agencies to consider potential environmental impacts, including 'all foreseeable direct and indirect impacts,' and

'should involve a discussion of adverse impacts that does not improperly minimize negative side effects.'" *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 885 (D. Mont. 2020) (quoting *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006)). While NEPA requires federal agencies to take a "hard look" at the consequences of their actions, it does not mandate a particular result. *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639–40 (9th Cir. 2004).

Here, Plaintiffs argue that the Forest Service violated NEPA by failing to abide by its obligation to take a "hard look" at the environmental impact of the Revised Plan in two respects: (1) the Forest Service failed to consider or disclose the consequences of the Revised Plan's road density requirements on grizzly bears, and (2) the Forest Service failed to consider or disclose the Revised Plan's impacts on bull trout. (Doc. 77 at 49–51.) Neither argument is persuasive.

### A.     Grizzly Bears

Plaintiffs allege that the Forest Service "failed to consider or disclose" that the Revised Plan would not use Amendment 19's road density standards or road reclamation requirements, and it did not seriously consider the negative effects that might result from the departure from Amendment 19's prohibition on high-use non-motorized routes in secure core grizzly habitats. (Doc. 77 at 49–50.) These contentions are belied by the record.

Plaintiffs claim that the Forest Service failed to disclose and consider the Revised Plan's departure from Amendment 19 during the EIS process. That argument fails because the Forest Service followed NEPA processes at both the draft and final EIS stages. Before issuing the final EIS, "[t]he NEPA process requires the agency to first prepare a draft EIS to submit for public review and comment." *Helena Hunters & Anglers Assoc. v. Marten*, 470 F. Supp. 3d 1151, 1161 (D. Mont. 2020) (citing 40 C.F.R. § 1502.9(a)). The Forest Service complied with this requirement and published a notice of availability of a draft EIS for the Revised Plan in June of 2016. FS-044935. The Draft EIS specifically stated that the Revised Plan "would replace A[mendment] 19 and other 1986 Flathead [Forest] plan direction related to grizzly bears in its entirety." FS-046497. Plaintiffs submitted comments in response to the draft EIS, (*see* Doc. 78 at ¶ 8), raising concerns that departing from the road density requirements under Amendment 19 would harm grizzly bear populations and habitat. *See* FS-070679, 070681–82, 071805–06. That Plaintiffs expressed their opposition to the Forest Service's proposed departure from Amendment 19's road density standards indicates that the Forest Service properly disclosed its proposal.

At the final EIS stage, the Forest Service fulfilled its "hard look" obligation because the Final EIS "consider[ed] all foreseeable and direct impacts" and "involve[d] a discussion of adverse impacts that [did] not improperly minimize

negative side effects." *N. Alaska Env't Ctr.*, 457 F.3d at 975. The Final EIS also included an explanation of why the Forest Service believed a change from Amendment 19 was warranted. *See, e.g.*, FS-054724. Additionally, the Final EIS contemplated the negative effects of implementing the "baseline" road requirements instead of maintaining the Amendment 19 requirements. *See* FS-052416. The Final EIS acknowledged that, among the Forest Service's potential alternatives, the alternative selected for the Revised Plan "would provide the most opportunity for wheeled motor vehicle use" within the Forest. FS-053067.

Lastly, the Final EIS considered the potential consequences, including adverse impacts, of high-use non-motorized routes in secure core habitat. The Forest Service directly responded to "concern[s] about effects of nonmotorized trails on grizzly bears or grizzly-bear human conflicts." FS-052866. The Forest Service cited multiple studies, ranging from 1985 to 2017, that considered the effect of use on non-motorized routes in core habitat area. FS-052866–67. In addition, as Defendant-Intervenors point out, the evidence on which Plaintiffs rely to show that high-use of nonmotorized routes in secure core will adversely impact grizzly bears is not compelling insofar as it considered Alaskan brown bears and did not distinguish between motorized and nonmotorized use. (*Compare* Doc. 97 at 49 ("Scientific evidence suggests a [negative reproductive] impact from high-use nonmotorized routes") *with* FS-153872–73 (analyzing impacts of human

15

recreation on Alaskan brown bears).) Thus, though Plaintiffs disagree with the conclusion the Forest Service reached, the Forest Service properly followed the NEPA framework to consider the environmental impacts and potential negative consequences of moving away from Amendment 19's standards.

## B.    Bull Trout

While Amendment 19 most directly affects grizzly bears, the Forest Service had an obligation to consider the effects any departure would have on bull trout because "NEPA's 'hard look' obligation requires agencies to consider potential environmental impacts, including 'all foreseeable direct and indirect impacts.'" *Wildearth Guardians*, 457 F. Supp. 3d at 885 (quoting *N. Alaska Env't Ctr.*, 457 at 975). In addition, "general statements about 'possible' effects and 'some risk'" are insufficient to satisfy NEPA's "hard look" requirement. *Id.* at 887 (quoting *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019)). Thus, Plaintiffs argue that the EIS for the Revised Plan is insufficient because it did not take the requisite "hard look" at the Revised Plan's departure from Amendment 19's road density requirements and its impact on bull trout. More specifically, Plaintiffs assert that the Revised Plan abandoned previous strict culvert management and removal requirements, inexplicably replacing them with weaker, discretionary standards in Guideline FW-GDL-CWN-01.

Plaintiffs are correct that the portion of the final EIS that generally discusses

the habitat threats to bull trout, *see* FS-052374–75, is insufficient alone to satisfy

NEPA's "hard look" requirement, *see Or. Nat. Desert Ass'n*, 921 F.3d at 1191.

But Plaintiffs' challenge is ultimately unavailing. First, the final EIS includes a

section that specifically considers the effects of "motorized trails, travel

management, and roads" on aquatic species, including bull trout. FS-052433–34.

The final EIS also considers the effects of the Revised Plan's road management on

aquatic species. *See* FS-052433–34. And, the Biological Assessment analyzed the

general effects of the proposed action, and it analyzed the potential impacts of

specific activities. *See* FS-107623–32.

Further, while Plaintiffs take umbrage with Guideline FW-GDL-CWN-01

because it has limited application and is discretionary, the Forest Service offered

an adequate explanation of its decision to implement that Guideline. The Forest

Service acknowledged that while guidelines are discretionary, their purpose must

be met. FS-051886. The Forest Service explained that the management flexibility

inherent in the guidelines was intended to further protections for aquatic species,

including bull trout. FS-051898. The Forest Service envisions that in most

circumstances this aim will be accomplished without a net increase in roads, FS-

054989, but Guideline FW-GDL-CWN-01 allows the Forest Service to achieve the

overall aim of reduced sedimentation in situations where an increase in road length

may be necessary, such as where an existing road in a watershed area can be

moved away from a stream, FS-054208; *see also* FS-054223. This explanation indicates that the Forest Service considered the possibility that a strict requirement prohibiting any net increases would be *less* beneficial to the aim of reducing sedimentation in the streams.

Moreover, the record shows that the Forest Service considered the impact of its change to the scope of the conservation watershed network under the Revised Plan. Plaintiffs argue that the Forest Service's analysis is deficient because the "geographic scope of the 'conservation watershed network' is narrower than the scope of pre-existing protections for bull trout habitat." (Doc. 77 at 51.) However, Plaintiffs do not cite any part of the record for this argument, and their position seems to largely take issue with the Forest Service's reduction in culvert monitoring within the conservation watershed network. (*See id.*; *see also* Doc. 78 at ¶ 98.) But the Forest Service explained that choice. The record shows that the Forest Service considered multiple alternatives to the Culvert Monitoring Plan, FS-054216–05420, and explained how an adaptive approach to monitoring would work, including consideration of a scenario in which the Plan could not be implemented, FS-107735–36.

In sum, the Forest Service adequately considered the bull trout-related impacts of the Revised Plan.

## II.   ESA

When a proposed agency action may affect a species protected by the ESA, the agency must consult with either the Fish and Wildlife Service or the National Marine Fisheries Service. *See* 16 U.S.C. § 1536(a)(2). Where the proposed action is "likely to adversely affect" listed species or critical habitat, the agencies must engage in formal consultation. 50 C.F.R. § 402.14. Such consultation results in the issuance of a biological opinion by the consulting agency—here, the Fish and Wildlife Service. *Id.* § 402.14(h). Under the ESA, the Fish and Wildlife Service must make a jeopardy determination to ensure that the proposed action is not likely to jeopardize protected species or adversely affect designated critical habitat. 16 U.S.C. § 1536(a)(2). The jeopardy determination must be based on "the best scientific and commercial data available." *Id.*

A biological opinion violates the ESA if it "fails to consider[] the relevant factors and articulate a rational connection between the facts found and the choice made." *Ctr. For Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1121 (9th Cir. 2012) (internal quotation marks and alternations omitted). The Forest Service's reliance on a deficient biological opinion violates the ESA. *Id.* at 1128. Further, the Fish and Wildlife Service must also issue an incidental take statement if the proposed action will result in the "take" of a protected species. 16 U.S.C. § 1536(b)(4). A "take" occurs if the species will be harassed, harmed, pursued, hunted, shot, wounded, killed, trapped, captured, or collected, or there

19

will be an attempt to engage in any such conduct, as a result of the action. *Id.* § 1532(19). Take statements must contain reasonable and prudent measures with implementing terms and conditions that minimize take and with which the action agency must comply. *See* 50 C.F.R. § 402.14(i).

In relation to the ESA, Plaintiffs present seven arguments, six against the Fish and Wildlife Service and one against the Forest Service. They are discussed in turn.

### A. Road Reclamation Requirements Claims (WildEarth Claim II, Count I; Swan Valley Coalition Claims I and II)

#### 1. Effects on Grizzly Bears

The 2017 BiOp states that "the presence of roads and associated human activities has detrimental impacts to grizzly bears." FWS-002005. The BiOp then explains that secure habitat is important to the survival of grizzly bears, and "[g]rizzly bear habitat security is primarily achieved by managing motorized access." FWS-002005. This is important because "grizzly bears that experience [] negative consequences learn to avoid the disturbance generated by roads and may not choose to use these habitats even long after road closures." FS-002029. While Federal Defendants attempt to refute this point, the study they cite indicated that the selection towards roads "was partially due to bears utilizing cutting units, or avalanche chutes which often terminated near roads. Few bears exhibited positive selection towards areas near roads having >60 vehicles/day." FS-182183. The

science supports Plaintiffs' argument that, generally, bears avoid roads, particularly motorized ones.

Since roads are "an important aspect of the problem" of maintaining grizzly bear populations, the Fish and Wildlife Service was obligated to consider the road reclamation and density standards of the Revised Plan. *See Save Our Cabinets v. U.S. Fish & Wildlife Serv.*, 255 F. Supp. 3d 1035, 1063 (D. Mont. 2017) (concluding that FWS's failure to consider "an important aspect of the problem" violated the ESA). The parties dispute the nature and scope of that consideration.

First, the parties disagree about whether the Fish and Wildlife Service had to "compare" Amendment 19 to the Revised Plan. Ultimately, Federal Defendants are correct that, under § 7 of the ESA, the Fish and Wildlife Service was not required to consider the environmental baseline against the proposed action. *See* 50 C.F.R. § 402.14(g). But, as Plaintiffs note, the baseline was established in 2011 while Amendment 19 was in effect. FS-052052. Consequently, though the Fish and Wildlife Service did not need to directly compare Amendment 19 with the Revised Plan, it did need to consider whether the Revised Plan would have an effect on the 2011 baseline, which was the product of the 1986 Forest Plan and its amendments, including Amendment 19.

Second, at the heart of the parties' conflict is whether the Fish and Wildlife Service was required to expressly consider the role of "closure devices" in road

density and management. In other words, are "closure devices" an "important aspect of the problem" to be addressed by the Revised Plan? The answer is yes.

Amendment 19 required the Forest Service to reclaim and render a road inaccessible to motor vehicles before excluding the road from road-density calculations. FS-178392. A reclaimed road was defined as a road that "ha[d] been treated in such a manner so as to no longer function as a road or trail and has a legal closure order until reclamation treatment is effective. This [could] be accomplished through one or a combination of treatments including: recontouring to original slope, placement of natural debris, or revegetation with shrubs or trees." FS-178392. This "reclaimed road" standard is the standard underlying the 2011 baseline. *See* FS-052052. The Revised Plan replaced the "reclaimed road" standard with an "impassable road" standard. An "impassible road" is

> a road that has been treated in such a manner that the road is blocked and there is little resource risk if road maintenance is not performed on a regular basis (self-maintaining).. . . Roads may become impassable due to a variety of causes, including but not limited to one or more of the following: natural vegetation growth, road entrance obliteration, scarified ground, fallen trees, boulders, or culvert or bridge removal. Impassible roads may remain on the inventoried road system if use of the road is anticipated at some point in the future. Some, but not all, roads placed in intermittent stored service may be impassable.

FS-052079. Impassible roads do not count in the total motorized route density as long the first 50 to 300 feet of the road "has been treated to make it inaccessible to wheeled motorized vehicles during the non-denning season." FS-052079. The

problem as it relates to grizzly bears, according to Plaintiffs, is that the "reclaimed road" standard from Amendment 19 "ensured the integrity of road closures and created a substantial disincentive for new road construction in grizzly habitat," while the mere "blocking" required under the Revised Plan will not have the same effect. (Doc. 77 at 27.)

In support of their argument, Plaintiffs insist that Federal Defendants knew that ineffective road closures could lead to motorized use of decommissioned roads. One of the studies Plaintiffs cite was performed by Plaintiff Swan View Coalition in 2004. FS-065784–97. That study found that in the Swan Lake Ranger District—an area encompassed by the Revised Plan—53 of the 169 routes (31.4%) showed no signs of use. FS-065788. The study concluded that roughly 68% of the remaining roads showed use because of ineffective road closures. FS-065788. Of those 116 ineffective closures, 67 were "permanent barriers" that showed signs of detour. FS-065788.

Federal Defendants argue that road closures are not an important part of the problem related to road use and density because a 1996–2005 Forest Service study demonstrated "that only 3 to 15% of gates, barriers, and signs were deemed ineffective, with the average at 7%." (Doc. 91 at 21 (citing FS-176296–97).) Because the overall grizzly bear population in the NCDE was increasing during the time of the study, Federal Defendants concluded that the level of road closure

effectiveness was not problematic. (*Id.*) However, the Forest Service's study only considered road closures ineffective if they could not be fixed by the inspector before leaving the inspection site, FS-176296, which means that some of these closure devices were allowing use before being remedied by inspection.

Thus, the science indicates that, even where "permanent barriers" are used, road closures may be ineffective and use may occur or continue. Both the Swan View Coalition Study and the Forest Service Study support that argument. Because the 2017 BiOp identified use management as the primary method of protecting grizzly bear habitat, which in turn maintains and protects grizzly bear populations, *see* FWS-002005, the Fish and Wildlife Service's failure to consider the effect of ineffective road closures was arbitrary and capricious. This conclusion is also bolstered by the fact that the 2017 BiOp cites at least one study that determined "that the leading cause of human-cause mortality [of NCDE grizzly bears] was management removals." FWS-002001; *but see id.* (noting that poaching and malicious kills may be underreported). Additionally, Federal Defendants' explanation in its summary judgment briefing about why it apparently did not consider road closure devices is impermissible post hoc rationalization. *See Motor Vehicle Mfrs.*, 436 U.S. at 50 (explaining that an agency's action may only be upheld on "the basis articulated by the agency itself," and the agency must make plain its course of inquiry, analysis, and reasoning).

24

In this case, the Fish and Wildlife Service violated the ESA by not considering the impact of ineffective road closures in its 2017 BiOp.

## 2. Bull trout

The ESA prohibits federal agencies from taking direct or indirect action that will "result in the destruction or adverse modification of [designated] critical habitat." 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.02. The 2017 BiOp acknowledges that the Revised Plan's effects on bull trout are indirect, and notes that "activities that disturb the soil surface adjacent to or in occupied habitat have the greatest potential to result in adverse effects to bull trout and bull trout critical habitat." FWS-001930–31. The BiOp states that roads can adversely affect bull trout and bull trout habitat, and one way to mitigate potentially damaging sedimentary runoff is culvert management. FWS-001934–45.

Plaintiffs argue that the 2017 BiOp runs counter to the evidence that roads harm bull trout in two ways: (1) it abandons Amendment 19's culvert removal requirements, and (2) it implements a less protective Culvert Monitoring Plan. Though both of Plaintiffs' bull trout-related ESA challenges deal with Amendment 19's culvert monitoring and removal standards, the challenges are distinct enough to warrant separate discussion. As explained below, Plaintiffs succeed on the first part of their challenge. The scientific evidence does not support the Revised Plan's shift away from mandatory culvert removal, particularly since the Fish and

Wildlife Service endorsed culvert removal as one of the most effective bull trout

protection tools just two years prior to the 2017 BiOp. *See* FS-017013. Plaintiffs

fail on the second part of their challenge, however, because the sort of

programmatic approach the Service takes is authorized under the ESA and is not

contrary to the evidence.

### a. Culvert Removal

The Fish and Wildlife Service's historic position on culvert removal—

including as recently as 2015—and its lack of explanation for moving away from

that position undercuts its argument that the Revised Plan's culvert removal

standards are based on the best available science. In a previous biological opinion

prepared for the Moose Post-Fire Project within the Flathead National Forest in

2002, the Fish and Wildlife Service noted that "any crossing structure would have

a 100% chance of failure over its installation life if it is not removed after the road

is abandoned." FWS-030236–37. That same opinion also found that "[a] culvert

that is designed for a 100-year event that would remain in for 10 years would have

a 9.6% chance of failure. The same culvert designed to stay in for 20-years would

have a 19.2% chance of failure." FWS-030236 (internal citation omitted).

Over a decade after acknowledging these findings, in 2015, the Fish and

Wildlife Service promulgated the Recovery Plan. The Recovery Plan identified

"culvert removal or redesign at stream crossings" as a factor for the success of bull

trout conservation efforts since 1999. FS-017008. It also identified sedimentation as a threat to bull trout and suggested that "sediment impacts from roads c[ould] be addressed by," among other things, "maintaining bridges, culverts, and crossings; or decommissioning surplus roads and removing culverts and bridges on closed roads." FS-017013. Notably, Amendment 19 was in effect when the Fish and Wildlife Service published the Recovery Plan, meaning Amendment 19's requirement that roads be "reclaimed," which included the culvert-removal requirement, was in place.

In its 2017 BiOp, the Fish and Wildlife Service noted that "[r]oad networks have been shown to have detrimental effects on water and aquatic resources in forested landscapes," FWS-001935, and "[t]he potential for roads to have detrimental effects on aquatic resources exists as long as the road is retained," FWS-001936. But, the BiOp also noted that proper design and maintenance of roads can effectively disperse sedimentation. FWS-001936. The Fish and Wildlife Service concluded that "[r]oad decommissioning reduces the long-term risk of sediment delivery to streams from roads and roadside ditches through reducing culvert failures and landslides," FWS- 001936–37, but road decommissioning under the Revised Plan does not include mandatory culvert removal, *see* FS-052079 (defining "impassable" road).

With this emphasis on the relationship between bull trout population and

habitat conservation and culvert management and removal, it is inexplicable why, two years after the Recovery Plan, the Fish and Wildlife Service determined that culvert removal is no longer required. Both Defendant-Intervenors and Federal Defendants point to guidelines within the Revised Plan that ostensibly function in the aggregate to remove problem culverts, but these guidelines do not address the root of the problem. For example, one of the Revised Plan's objectives is to decommission or place into storage 30 to 60 miles of road over roughly the next 15 years, which the Fish and Wildlife Service avers will have the effect of improving watershed conditions by decreasing road density. FWS-001937 (citing Guideline FW-OBJ-IFS-01). This Guideline does not mention culverts.

Defendant-Intervenors also point to Guidelines FW-OBJ-WTR-02 and 03 as guidelines that "help to remove or mitigate risk factors associated with roads," though neither mentions culverts specifically. *See* FWS-001937. In response to public comments, the Fish and Wildlife Service explained that FW-OBJ-WTR-02 emphasizes "stormproofing," to "either upgrade or decommission the road" to reduce the risk of future sediment delivery. FS-054201. The response identifies "reducing hydrologic connectivity" as a means through which stormproofing could be accomplished, FS-054201, and though Federal Defendants say that the Guideline would reduce "stream crossing failures" and these failures "include damaged culverts," (Doc. 91 at 23 n.7), this clarification is not in the record. The

28

Fish and Wildlife Service also explained that FW-OBJ-WTR-03 would emphasize reconnecting stream habitat to provide for fish passage. FS-054201. But the Fish and Wildlife Service's response makes clear that this Guideline is concerned with providing routes for fish spawning, not with mitigating sedimentation. *See* FS-054201.

Because the 2015 conclusion that road decommissioning, which included culvert removal, was an effective sedimentation reduction measure, the Fish and Wildlife Service has not explained its conclusion just two years later that culvert removal was not required on decommissioned roads. While the Service did conclude that non-motorized roads posed less of a threat for culvert failure and, consequently, sedimentation, this conclusion rests on the assumption that road closures are effective. Nonetheless, the evidence undermines this assumption. *See also All. for Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1195 (D. Mont. 2019) (concluding that Fish and Wildlife Service's failure to consider impact of ineffective road closures constituted a violation of the ESA). Therefore, the record supports Plaintiffs' arguments that the Fish and Wildlife Service's abandonment of the culvert removal requirement was arbitrary and capricious.

### b. Culvert Monitoring Plan

The Culvert Monitoring Plan adopted in the Revised Plan provides for monitoring of culverts remaining on a subset of closed roads only once every six

years. FS-054755. Under Amendment 19, culverts were monitored annually and culverts that failed or were in the process of failure were removed. FS-107731. While Amendment 19 was in place, Federal Defendants expected that one or fewer culverts would fail each year. FS-107731. Plaintiffs maintain that the 6-year rotating inspection schedule under the Culvert Monitoring Plan did not consider the threats a reduction in monitoring would pose to bull trout habitat. Plaintiffs are wrong.

Pursuant to the Culvert Monitoring Plan, groups of bull trout habitats would be monitored on a six-year rotating panel. FS-107733. "The groups were developed based on the logistics of monitoring and the relative miles of system road and historic road." FS-107733. The Plan noted that in most cases, "roads that had been decommissioned (historic roads) had stream culverts removed." FS-107733. The Plan also clarified that the six-year schedule was not static: "For example, if crews complete all culverts in a given panel before the season is over, they may move to the next panel." FS- 107736.

The Fish and Wildlife Service's implementation of an adaptive Culvert Monitoring Plan is reasonable and responsive to the reality of the culvert situation in the Forest. Indeed, under Amendment 19, it was anticipated that one or fewer culverts would fail each year. FS-107731. The Culvert Monitoring Plan explained that an adaptive plan would avoid duplicative monitoring, FS-107736, and, since

most culverts had been removed from historic roads, the number of culverts at risk of failing had been reduced, FS-107733–34. Thus, the Fish and Wildlife Service did not violate the ESA in implementing the Culvert Monitoring Plan.

## B.    Relevant Population Claims (WildEarth Claim II, Count I)

The parties agree that the NCDE grizzly population plays a significant role in genetic diversity in the region. (Doc. 93, ¶ 21.) The ESA's implementing regulations at 50 C.F.R § 402.14(g) articulate the requirements of the Fish and Wildlife Service during formal consultation. In this case, the Service complied with § 402.14(g)(2), which required it to evaluate the current status and environmental baseline of the listed species. The 2017 BiOp identified the range-wide status of grizzly bears and provided statistics on their status within each of the six (five populated)[4] grizzly bear recovery zones in the lower 48 states. *See* FWS-001992–2004. Even so, the Service did not comply with § 402.14(g)(3), which requires more than mere recitation of statistics and instead obligates the Service to "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat." While the Service did provide a thorough overview of the status of the grizzly bear species in the United States, it failed to analyze how the Revised Plan would affect grizzly bears outside of the NCDE.

---

[4] The record indicates that the Bitterroot Ecosystem was not populated with grizzlies at the time this case was filed, but at oral argument the parties indicated that grizzlies have recently been identified in the Bitterroot Ecosystem.

In an effort to refute this point, Defendant-Intervenors argue that the BiOp considered the effect of the Revised Plan on grizzly bears because it established two demographic connectivity areas. However, these connectivity areas only consider the effect of the NCDE population on the populations of the Cabinet-Yaak Ecosystem and the Bitterroot Ecosystems. FWS-001982. Moreover, defendants point to the Service's conclusion that "[c]onnectivity among ecosystems will support a more robust grizzly bear population in the lower U.S. as a whole" as evidence that the Service satisfied its obligation to consider the effects of the Revised Plan on the grizzly population nationwide. (*See* Doc. 87 at 23 (quoting FWS-002061); Doc. 91 at 27 (same).) In this case, the portion of the BiOp that discusses connectivity in greater depth does so only as it relates the Cabinet-Yaak population, despite the fact that earlier in the BiOp the Service emphasized the connectivity would benefit the Bitterroot Ecosystem as well. FWS-001994. Finally, the BiOp does not consider whether the Revised Plan will have an effect on the GYE population, a fact the Service should have considered given the Ninth Circuit's recent emphasis on the relationship between the NCDE population and the GYE population.[5] *See Crow Indian Tribe v. United States*, 965

_____

[5] When the 2017 BiOp was published, the Fish and Wildlife Service found that the GYE grizzly bear population had sufficiently recovered so that it was no longer listed under the ESA. (*See* Doc. 87 at 21.) However, the Ninth Circuit since affirmed the district court's ruling that the decision to delist the GYE population was arbitrary and capricious. *Crow Indian Tribe*, 965 F.3d at 680.

F.3d 662, 678–80 (9th Cir. 2020).

Defendant-Intervenors also attempt to argue that the Forest Service considered the effects on the NCDE population and extrapolated those effects onto the grizzly bear population at-large in a permissible "hierarchical" analytical technique. For support, Defendant-Intervenors point to *Rock Creek All. v. United States Forest Service.* 703 F. Supp. 2d 1152, 1205 (D. Mont. 2010) *(Rock Creek III), aff'd in part sub nom. Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439 (9th Cir. 2011). In *Rock Creek III*, the Court found the Fish and Wildlife Service's explanation of its no-jeopardy determination for bull trout in an updated biological opinion was sufficient under the ESA. *Id.* The Court held that the no-jeopardy conclusion was rational because the bull trout population at issue was "so relatively small that the damage w[ould] not register at the core area, management unit, or distinct population segment levels." *Id.* But *Rock Creek III* supports Plaintiffs' position. As demonstrated by the discussion above, which emphasizes the impact the NCDE grizzly population has on the species as a whole, the NCDE grizzly bear population represents a more significant segment of the population than did the bull trout in *Rock Creek III*. Consequently, the Fish and Wildlife Service could not properly use the hierarchal analysis it purports to here.

In sum, the Fish and Wildlife Service violated the ESA when it failed to consider the effects of the Revised Plan on the national grizzly population.

## C.    Access Conditions Claims (WildEarth Claim II, Count I)[6]

The defendants cannot justify the implementation of the 2011 access

conditions in the Revised Plan.  Under the defendants' theory, because the goal of

the ESA is the recovery of listed species, and the population of the NCDE grizzlies

was increasing in 2011, the goal of the ESA has been met and the agencies

properly pivoted to a different management technique.  Federal Defendants point

to the BiOp as evidence that they considered the best available science in

implementing the 2011 baseline.  However, their cited studies do not entirely

support their arguments.  For example, the 2015 Teisberg study speaks to grizzly

bear body condition and food supply, which has no clear bearing on access

conditions and grizzly bear population.  FWS-002001.  While the 2016 Costello

study does speak to the relationship between access conditions and grizzly bear

population and concluded that "the leading cause of human-caused mortality was

management removals," that conclusion is undercut by the recognition that illegal

kills may be underreported.  FWS-002001.

By contrast, Plaintiffs persuasively argue that the Service cannot arbitrarily

---

[6] The parties quarrel over "the 2011 access conditions" but this term is not in the record.  Context suggests they are arguing about the 2011 "baseline," *see* FS-053322, which is defined as "conditions as of December 31, 2011, as modified by changes in numbers that were evaluated and found to be acceptable through the [ESA] section 7 consultation with [the Fish and Wildlife Service] while the grizzly bear was listed as threatened."  FS-052052.

pinpoint 2011 as the point in time at which to attach significance to the NCDE population. The mere fact that the population was increasing from 2004–2011 does not justify moving away from the existing management requirements of Amendment 19. In effect, by recognizing that Amendment 19 laid the foundation for recovery of the NCDE population and then using that recovery as justification for getting rid of the existing access conditions, the Fish and Wildlife Service eschews Amendment 19 precisely because it was working. This action is arbitrary and capricious. *C.f., Shelby Cty., Ala. v. Holder*, 570 U,S, 529, 590 (2013) ("Throwing out preclearance when it has worked and is continuing to work to stop discriminatory changes is like throwing away your umbrella in a rainstorm because you are not getting wet.") (Ginsburg, J., dissenting). The Fish and Wildlife Service violated the ESA by arbitrarily adopting the 2011 access conditions as a target for protecting grizzly bears.

### D. Winter Motorized Travel Claims (WildEarth Claim II, Count I)

Plaintiffs' next ESA claim is based on the Revised Plan's incorporation of Amendment 24. In 2006, Amendment 24 designated 787,000 acres and 3,000 miles of roads and trails for over-snow vehicle use. (Doc. 51 at 4.) The Revised Plan incorporates Amendment 24's over-snow vehicle use designations pursuant to the Over-Snow Vehicle Rule's grandfather provision, identifies 567 additional acres as suitable for over-snow vehicle use, and provides for site-specific planning

35

within three years to determine whether any of the 567 acres should be designated. (*Id.* at 5.) Plaintiffs make the claim that the Fish and Wildlife Service's action related to winter motorized travel violated the ESA in two ways: (1) the Service's action was not "coextensive" because its no-jeopardy determination for grizzlies and lynx relied on a description of the proposed action that omitted winter motorized travel designations, and (2) the Service failed to evaluate winter motorized designations as interrelated actions. Plaintiffs' arguments fail on both counts.

First, the Revised Plan did not actually implement any new over-snow vehicle route designations. Though the Revised Plan identifies an additional 567 acres suitable for use, it does not actually designate any new areas for use. FS-049275; *see also* FS-052309–10. The grandfather provision of the 2015 Over-Snow Vehicle Rule specifically allows national forests that previously designated over-snow vehicle routes to maintain those designations. 36 C.F.R. § 212.80(b); *see also id.* § 212.81(b). Thus, the designations from Amendment 24, which have been in place since 2006, were considered as part of the 2011 baseline in the 2017 BiOp. FWS-002022. The BiOp identified the different percentages of grizzly primary conservation area that was subject to the route designations from Amendment 24. FWS-002022. These percentages were based on the most recent data from the Forest Service and the Montana Fish Wildlife and Parks Service's

monitoring of "motorized over-snow use as well as known den locations and bears emerging from their dens." FWS-002022. Similarly, the 2017 BiOp explained that the designated routes from Amendment 24 were incorporated into the Revised Plan's consideration of the Plan's impact on Canadian lynx and their habitat. FWS-002124–25. The 2017 BiOp's explanation of how the Revised Plan would result in a decrease of open snowmobiling routes in lynx habitat, *see* FWS-002125, demonstrates that the Forest Service complied with 50 C.F.R. § 402.14(g)(4), which requires it to consider "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the baseline."

Plaintiffs' reliance on *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), is unpersuasive. In *Conner*, the Court held that "biological opinions must be coextensive with the agency action and [ ] stipulations cannot be substituted for comprehensive biological opinions." *Id.* at 1458 (footnote omitted). *Conner* involved oil and gas leases on national forest land in Montana. *Id.* at 1443. The leases included mitigation stipulations authorizing the government to regulate— and, in some cases, altogether preclude—certain mining activities on the land, but the leases did not contain specific plans for the activities that would be conducted on the land post-lease. *Id.* at 1444. Under the ESA, the Forest Service engaged the Fish and Wildlife Service in formal consultation, requesting a jeopardy

determination on the effects of the oil and gas leases on endangered species. *Id.* The Fish and Wildlife Service concluded it had insufficient information about the nature of the post-leasing activities to consider those activities in the biological opinion; as a result, the Fish and Wildlife Service "proposed ongoing consultation and preparation of additional biological opinions at various stages of post-leasing activities." *Id.* This "incremental approach," the court concluded, risked "piecemeal chipping away of habitat." *Id.* at 1454.

The Fish and Wildlife Service's determination of additional acreage here does not raise the same specter. Unlike the mining activity that was sure to follow the leases in *Conner*, the suitability determination does not guarantee that over-snow vehicle use will occur—it merely indicates that such use could occur in the future. And, in *Conner*, the Service improperly concluded that "there [wa]s insufficient information available to complete a comprehensive opinion." *Id.* at 1455. By contrast, in this case, the Fish and Wildlife Service has not claimed it has insufficient information, but rather has asserted it will undertake a programmatic review of any proposed action in the future. *See* FWS-02058. This sort of review is expressly permitted under the ESA. 50 C.F.R. § 402.02.

Plaintiffs' second argument—that the Fish and Wildlife Service violated the ESA because it did not consider "interrelated" actions—is more compelling, but ultimately fares no better. At the time the Revised Plan was implemented, the ESA

defined "interrelated actions" as "those that are part of a larger action and depend on the larger action for their justification." 50 C.F.R. § 402.02 (2016). "The test for interrelatedness or interdependentness is 'but for' causation: but for the *federal* project, these activities would not occur." *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1225 (9th Cir. 2015) (internal quotation marks and alteration omitted). Plaintiffs argue that the 2017 BiOp failed to consider that the Revised Plan "replaced Amendment 24 in its entirety," and so, but for the Revised Plan's adoption of the over-snow vehicle designations, those designations would not have occurred. (Doc. 77 at 38.) The argument misses the point. The over-snow vehicle designations were the status quo before the Revised Plan was implemented. This means, even if the Revised Plan were not implemented, the over-snow vehicle designations would have occurred. As a consequence, the Revised Plan was not the "but-for" cause of the designations. *See Sierra Club*, 786 F.3d at 1225.

E.    **Grizzly Incidental Take Statement Claims (WildEarth Claim II, Count I)**

Plaintiffs next allege that the Fish and Wildlife Service violated the ESA by issuing a flawed incidental take statement for grizzly bears. The ESA requires the preparation of an incidental take statement in situations where the Service concludes that an action will result in the incidental take of a listed species but such take will not violate § 7 of the ESA. 50 C.F.R. § 402.14(i). An incidental take statement must specify the impact of the incidental take upon a species;

39

however, the Service may use a "surrogate"—a similarly affected species or habitat or ecological condition—to express the extent of the anticipated take so long as the take statement "[d]escribes the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and sets a clear standard for determining when the level of anticipated take has been exceed." *Id.* § 402.14(i)(1)(i).

The incidental take statement must also specify "reasonable and prudent measures . . . necessary or appropriate to minimize such impact," establish the terms and conditions with which the federal agency must comply to implement minimization and disposition measures, and specify "the procedures to be used to handle or dispose of any individuals of a species actually taken." *Id.* § 402.14(i)(1), (ii), (iv), (v). Furthermore, neither the reasonable and prudent measures, nor the terms and conditions that implement them, may alter the basic nature of the action and may involve only "minor changes." *Id.* § 402.14(i)(2).

Plaintiffs advance three reasons that the incidental take statement was deficient: (a) the Service employed an inadequate road density and secure core habitat surrogate; (b) the Service employed an inadequate road density and secure core surrogate; and (c) the Service employed an inadequate over-snow motorized use surrogate. The defendants respond that the Service's decisions are reasoned,

unambiguous, and comply with the ESA. Each of the Plaintiffs' arguments is addressed in turn. Ultimately the take statement is flawed insofar as the Service employed an inadequate road density and secure core habitat surrogate as argued under (a), but it is valid in all other respects.

### 1. Inadequate road density and secure core habitat surrogate

Plaintiffs successfully challenge all three deficiencies they identify concerning the road density and secure core habitat surrogate. The surrogate trigger is ambiguous, lacks a deadline, and the supposed requirement to maintain 2011 access conditions is not linked to a requirement in the Revised Plan.

As a threshold matter, the Fish and Wildlife Service identified its road density and secure core habitat surrogate as "the research benchmark levels of [open motorized route density], [total motorized route density], and secure core." FWS-002067. These levels reflect the 19-19-68 ratio embodied by Amendment 19. FWS-002067. The 2017 BiOp states that the Service "anticipate[s] that some level of incidental take of female grizzly bears will occur within individual subunits" as long as the 19-19-68 ratios are not met. FWS-002067.

Plaintiffs' first argument is that the surrogate lacks a proper trigger. "The 'trigger' in an incidental take statement must set a 'clear standard for determining when the authorized level of take has been exceeded.'" *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 342 F. Supp. 3d 1047, 1062 (D. Mont. 2018) (citing

41

*Ariz. Cattle Growers' Ass'n v. Fish & Wildlife Serv.*, 273 F.3d 1229, 1251 (9th Cir. 2001)). According to Plaintiffs, the incidental take statement's trigger is ambiguous because it states that impermissible levels of incidental take will occur when projects result in changes to the 19-19-68 baselines "beyond those permitted by the Revised Forest Plan and analyzed in th[e] biological opinion." (Doc. 77 at 40 (quoting FWS-002067).)

Defendant-Intervenors disagree, insisting that the trigger is sufficient. For support, Defendant-Intervenors point to the portion of the BiOp that states that "[c]hanges are calculated using a 10-year running average as described above and in Appendix 3 of this biological opinion." *See* FWS-002067. But Appendix 3 provides for a six-year running average, not ten. *See* FS-179077. Federal Defendants are more helpful. They identify the portion of the Revised Plan that provides that secure core numbers cannot exceed the following over a ten-year period: 5% temporary increase in open motorized route density in each subunit; 3% temporary increase in total motorized route density in each subunit; and 2% temporary decrease in secure core in each subunit. FS-051945.

While these standards cut against Plaintiffs' argument that the trigger is ambiguous, the trigger suffers from a fundamental flaw that the Service cannot elude with these standards. The BiOp acknowledges that 32 of the 47 subunits in the Forest do not meet the 19-19-68 benchmarks. FWS-002067. Given that the

BiOp indicates that "some level of incidental take will occur" when the 19-19-68 benchmarks are not met, FWS-002067, as Plaintiffs note, "[i]t is especially unclear how the benchmarks provide a clear trigger for the thirty-two subunits that already exceed one or more of the benchmarks," (Doc. 100 at 35.)

Additionally, Plaintiffs persuasively argue that the surrogate is inadequate because there is no requirement in the Revised Plan to return to 2011 access conditions. As explained above, the 2011 access conditions were the result of Amendment 19's road density requirements. The Revised Plan does not incorporate those requirements, so it is unclear how the 2011 access conditions ensure that "temporary changes" will not be indefinite. (*Cf.* Doc. 91 at 36.) As a result, the road density and secure core habitat surrogate violates the ESA.

## 2. Spatial and temporal surrogates

Plaintiffs are unpersuasive in arguing the spatial and temporal surrogates are inadequate. The allegedly insufficient surrogate provides: "[i]f on-the-ground implementation of a project exceeds five years, or if a project concurrently impacts [open motorized route density], [total motorized route density], or secure core in more than three adjacent subunits, the level of take exempted under this biological opinion would be exceeded." FWS-002067–68. According to Plaintiffs, "on-the-ground implementation of a project" is ambiguous, as is the five-year time limit. (Doc. 77 at 42.) Likewise, "concurrently impacts" is allegedly ambiguous because

43

it may be interpreted to encompass *all* impacts, regardless of whether they are positive or negative, and vague because "concurrently" does not clarify whether it refers to route density or secure core being impacted at one time, impacts to any of the values occurring simultaneously in adjacent subunits, or both. None of these arguments are convincing.

Plaintiffs' first argument fails because the Revised Plan specifically defines "project" "for purposes of the motorized access standards and guidelines in the primary conservation area of the [NCDE]" as "any temporary activity requiring construction of new roads, temporary roads, reconstruction or opening of restricted roads during the non-denning season, if such use exceeds administrative use levels." FS-052075. "Administrative use" is a defined term. FWS-002276. Consequently, these terms are not ambiguous.

Plaintiffs' second argument has more traction, but it, too, fails to carry the day. While Plaintiffs are correct that the terms of a guideline are not mandatory, Guideline FW-GDL-IFS-01 was incorporated as a "non-discretionary" term and condition of the BiOp. (*See* Doc. 91 at 37 (citing FWS-00260–70)). Plaintiffs respond that the Service's comments indicate that the five-year period is ambiguous, (Doc. 100 at 37 (citing FS-051946–47)), but the comment to which Plaintiffs cite explains the exception to the five-year requirement ("agency contracts must allow for the extension of contract term lengths under qualifying

44

conditions"), and thus the five-year period itself is not ambiguous. FS-179031.

Moreover, while Plaintiffs are correct that "impacts" could mean any degree of change, upwards or downwards, if the impact results in a decrease in route density, that decrease would benefit the listed species. Similarly, an impact resulting in an increase in secure core would benefit the listed species. Thus, to the extent an ambiguity exists, that ambiguity seems to favor the species. *See Swan View Coalition v. Barbouletos*, 2008 WL 5682094, *15 (D. Mont. June 13, 2008) ("The ESA requires that protected species be given the benefit of the doubt in management decisions.") (internal quotation marks omitted). Because route density and secure core are related, "impact" may be the most precise term with which to define the triggering event: a decrease in total motorized route density could lead to a decrease in open motorized route density, and would likely lead to an increase in secure core. Under the surrogate, if this combination occurred in three adjacent subunits at the same time, it would trigger reinitiation. *See* FWS-002068.

Relying on *Arizona Cattle Growers'*, Plaintiffs assert that the surrogates fail to articulate a rational connection to the taking of grizzly bears. But *Arizona Cattle Growers'* makes clear that the causal link requirement means "only that [the Service] must establish a link between the activity and the taking of species before setting forth specific conditions." *Id.* at 1250. In the final EIS, the Forest Service

explains the temporal surrogate based on two Guidelines, FW-GDL-IFS-01 and -

02. FS-054311. The five-year timeline is linked to take of grizzly bears because

> the average age of first reproduction in the NCDE is 5.4 years old, but
> can vary from 3–8 years of age. The average time between litters in the
> NCDE is 3.0 years. Thus, at a forestwide scale, a combination of
> permanent secure core and limitations on temporary reductions in
> secure core should meet the needs of the grizzly bear population.

FS-054311. The pertinent Guidelines are incorporated into the Revised Plan as

mandatory standards. FWS-002070. Given this explanation, the temporal

surrogate is not arbitrary nor capricious. *Cf. Ariz. Cattle Growers'*, 273 F.3d at

1250–51.

Similarly, an explanation refutes Plaintiffs' argument that the spatial

surrogate is flawed: the no-more-than-three-adjacent-subunits rule "will provide

grizzly bears within a project subunit the opportunity to move away from activities

into undisturbed subunits." FWS-002067. A map of the grizzly bear security core

shows that the spatial surrogate enables grizzly bears to move within the NCDE

without being completely displaced. FS-052125. Thus, the spatial surrogate is not

arbitrary nor capricious.

Finally, Plaintiffs' argument that the surrogates are inadequate because they

lack reporting requirements is unpersuasive. Under § 402.14(i)(3), the relevant

federal agency "must report the progress of the action and its impact on the species

to the Service as specified in the incidental take statement." This regulation

46

"makes clear that the Service is responsible for specifying in the statement how the action agency is to monitor and report the effects of the action on listed species." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th Cir. 2010). Plaintiffs concede that the surrogate includes a reporting requirement for the completion time for a project within the NCDE. Consequently, the dispute hinges on whether the reporting requirement for the spatial surrogate is valid. It is. Beyond the plain language of the surrogate, the terms and conditions of the incidental take statement clarify that reinitiation is triggered by "[c]oncurrent, temporary increases" in road density or "concurrent, temporary decreases in secure core for new projects" that occur in more than three adjacent subunits. FWS-002070.

The temporal and spatial surrogates are not arbitrary nor capricious.

### 3.    Motorized over-snow use surrogates

Finally, Plaintiffs argue that the motorized over-snow use surrogates are invalid because they are impermissibly coextensive, ambiguous, and lack a reporting requirement. The surrogate states:

> If late season motorized over-snow vehicle use (i.e., after March 31) occurs on more than three percent of modeled denning habitat within the [primary conservation area] on the [Forest], or more than 19 miles of routes are open to late season motorized over snow vehicles in modeled denning habitat, then the amount of take . . . would be exceeded, and reinitiation or project-specific consultation would be required.

FWS-002069.

47

On the first argument, the parties agree that the surrogate is coextensive with the project. (Doc. 77 at 45; Doc. 91 at 39.) Their disagreement centers on whether coextensiveness is per se impermissible. Plaintiffs rest their argument on *Oregon Natural Resources v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007). In *Allen*, the Court held that the trigger in an incidental take statement was invalid because "the permissible level of take [wa]s coextensive with the project's own scope" such that the "Incidental Take Statement and [biological opinion] [we]re rendered tautological." *Id.* at 1040. Similarly, here, the surrogate reflects the current status of motorized over-snow use during the den emergence period: three percent of over-snow vehicle use during the late season and no more than 19 miles of over-snow motorized routes in denning habitat. FWS-002048. But Federal Defendants argue that the surrogate is permissible pursuant to a final rule the Fish and Wildlife Service promulgated in 2015 that directly refuted the reading of *Allen* that Plaintiffs champion. (Doc. 91 at 39 (citing 80 Fed. Reg. 26,832 (May 11, 2015)).) The rule specifically contemplates surrogates that are "fully coextensive with the anticipated impacts of [a] project," and concludes that so long as the surrogate includes a proper monitoring requirement, such coextensive surrogates are valid. 80 Fed. Reg. at 26,834. Though few courts have addressed this final rule since its implementation, it appears Federal Defendants have the upper hand here. *See Columbia Riverkeeper v. U.S. Army Corp of Eng'rs*, ___ F. Supp. 3d ___, 2020 WL

48

6874871, *10 (W.D. Wash. Nov. 23, 2020) (recognizing permissibility of coextensive surrogates based on 80 Fed. Reg. at 26,834); *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir. 2018) (same).

Plaintiffs' arguments concerning alleged ambiguity and lack of a reporting requirement are disingenuous. The plain language of the surrogate establishes to what the three percent refers: reinitiation will be triggered if late season motorized over snow vehicle use occurs on more than three percent of the modeled denning habitat within the primary conservation area. FWS-002069. Even if Plaintiffs' strained reading of "occurs on" as referring to something other than actual use were compelling—which it is not—in the event mere designation constituted an "occurrence" and counted toward the requisite trigger percentage, this reading would favor the bears and result in lower actual use. And, as Federal Defendants note, MON-NCDE-03 is tied to FW-STD-REC-05, which requires no net increase in the percentage of area or route for over-snow vehicles. (Doc. 91 at 40 (citing FS-052039, FS-052046).)

Ultimately, therefore, this surrogate is valid.

### F.     Omitted Incidental Take Statement for Bull Trout Claim (WildEarth Claim 2, Count I)

Plaintiffs continue by arguing that the Fish and Wildlife Service violated the ESA when it failed to provide an incidental take statement for bull trout or bull trout critical habitat. In response, the defendants argue that the Service fulfilled its

obligations under the ESA based on the language in the regulations that,

> [f]or a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate.

(Doc. 91 at 40 (quoting 50 C.F.R. § 402.14(i)(6)); *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1068 (9th Cir. 2004) (explaining that "programmatic environmental analysis supplemented by later project-specific environmental analysis" is permissible under the ESA) *superseded by statute on other grounds as recognized in All. for the Wild Rockies v. Savage*, 783 Fed. App'x 756, 757 (9th Cir. 2019).) Because the Revised Plan is programmatic, Federal Defendants have the better argument.

After identifying "future activities that may adversely affect bull trout" and their habitat, the 2017 BiOp states that "[t]he proposed action reduces the potential for incidental take to occur as a result of these actions. The mere potential for future take from these actions is not a legitimate basis for providing an exemption for take." FWS-001960. The BiOp then states that the Service will engage in "[s]ubsequent consultation, as appropriate," and the Service will take any necessary measure "to minimize the impacts of take on bull trout in accordance with 50 C.F.R. 402.14(i)." FWS-001960. Relying on *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1907–10

(2020), Plaintiffs argue that Federal Defendants cannot now look to § 402.14(i)(6) to defend their decision not to include a take statement on the basis that any reliance on the regulation is a "post hoc rationalization that this Court should reject." (Doc. 100 at 41.) But, as Federal Defendants note, § 402.14(i)(6) was specifically referenced in the 2017 BiOp and was in effect at the time the opinion was released. (Doc. 102 at 19 (citing FWS-001960).) It is mistaken to categorize the Federal Defendants' explanation as post hoc rationalization.

Additionally, by definition, Federal Defendants did not have to include an incidental take statement for bull trout. The Revised Plan is programmatic in its approach to bull trout and bull trout critical habitat. *See* 50 C.F.R. § 402.02 (defining "framework programmatic action" in the context of incidental take statements as an "action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future actions" occur). Thus, under § 402.14(i)(6), Federal Defendants were not required to include a take statement for bull trout.

### G. Reliance on Biological Opinion Claim (WildEarth Claim II, Count II; Swan Valley Claims I and II)

Plaintiffs' final ESA claim is directed at the Forest Service and turns on the validity of the 2017 BiOp. They allege that the Service violated the ESA by relying on the flawed 2017 BiOp without satisfying its independent obligation to

51

consider how the Revised Plan could jeopardize grizzly bears, bull trout, and bull trout habitat. (Doc. 77 at 48 (citing *Save our Cabinets*, 255 F. Supp. 3d at 1063).) Plaintiffs are correct in some respects, but only insofar as the 2017 BiOp was invalid based on its determinations that the Revised Plan's shift away from Amendment 19's road closure requirements would not jeopardize grizzly bears, the non-mandatory culvert removal aspect of the Revised Plan would not jeopardize bull trout, the Revised Plan considered its effect on the nationwide grizzly population, the adoption of the 2011 access conditions was reasonable, and the road density and secure core surrogate for grizzly bears was adequate.

As discussed above, the 2017 BiOp did not consider the impact of ineffective road closures on the 2011 baseline population for grizzly bears, nor did it consider the effects of the Revised Plan on the grizzly species as a whole. The BiOp's road density and secure core surrogate concerning grizzly bears is also deficient, as described above. Such failures render the 2017 BiOp faulty in its conclusions concerning grizzly bears. *See All. for Wild Rockies*, 412 F. Supp. at 1204 (finding that biological opinion was flawed because the Service failed to consider temporary increases in motor route density as a result of ineffective road closures).

The BiOp also did not consider the effect on bull trout of withdrawing the mandatory culvert removal requirement. The problem with the Forest Service's

reliance on the 2017 BiOp's conclusion that the less stringent culvert removal plan would not significantly adversely affect bull trout is magnified in light of the Recovery Plan, which identified culvert removal as an aspect of successful bull trout recovery just two years before the 2017 BiOp and three years before the Revised Plan. *See* FS-017008. Ignoring "information that would undercut the opinion's conclusions" violates the Forest Service's obligation under § 7 of the ESA. *Ctr. for Biological Diversity*, 698 F.3d at 1127–28. For their part, Federal Defendants argue that there is no information that undercuts the Fish and Wildlife Service's conclusion. But, as mentioned above, it is confusing why the Fish and Wildlife Service made no reference to its own Recovery Plan. Federal Defendants also argue that although certain record documents "may not have been discussed, they were taken into account." (Doc. 91 at 42.) However, an agency's action may only be upheld on the "basis articulated by the agency itself," *Motor Vehicle Mfrs.*, 463 U.S. at 50, and so even if Federal Defendants did "take the documents into account," their assurances are not interchangeable with the duty to consider relevant information and articulate that consideration in their decision.

In conclusion, the Forest Service violated the ESA to the extent it relied on the BiOp's flawed road reclamation determinations and road density surrogate.

## III.   The Travel Management Rule (WildEarth Claim I, Count I)

### A.   Executive Orders

In 1972, President Nixon issued Executive Order 11644, directing federal land management agencies to adopt regulations governing the use of off-road vehicles on public lands. 37 Fed. Reg. 2877 (Feb. 8, 1972). The order specifically instructs the agencies "to provide for administrative designation of the specific areas and trails" where off-road vehicle use may be permitted. *Id.* § 3. The agency designations must "be based upon the protection of the resources of the public lands, promotion of the safety of all users of those lands, and minimization of conflicts among the various uses of those lands." *Id.* The designations must also comply with certain enumerated "minimization criteria," including that areas and trails shall be located to minimize "damage to soil, watershed, vegetation, or other resources of the public lands," "harassment of wildlife or significant disruption of wildlife habitats," and "conflicts between off-road vehicle use and other existing or proposed recreational uses." *Id.*

In 1977, President Carter issued Executive Order 11989, amending Executive Order 11644 to "clarify agency authority" and strengthen the protections against adverse impacts from off-road vehicle use. 42 Fed. Reg. 26,959 (May 24, 1977). Executive Order 11989 directs land management agencies to close areas and trails where off-road vehicle use "will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources of particular areas or trails of the public lands." *Id.* § 2.

## B.     Forest Service Rules

Until 2005, the Forest Service regulations implementing Executive Orders

11644 and 11989 allowed each national forest to designate areas and trails open to

off-road vehicle use through established land management planning processes.  36

C.F.R. § 295.2 (repealed 2005); *WildEarth Guardians v. Mont. Snowmobile Ass'n,*

790 F.3d 920, 929 (9th Cir. 2015).  Under this approach, "many National Forests

managers kept their Forests generally open to motor vehicle use unless there was a

pressing reason for closure." *Winter Wildlands All. v. U.S. Forest Serv.*, 2013 WL

1319598, at *3 (D. Idaho Mar. 29, 2013).  In 2005, recognizing the need to address

the growing use and increased capabilities of modern off-road vehicles, the Forest

Service issued the Travel Management Rule.  70 Fed. Reg. 68,264 (Nov. 9, 2005)

(codified at 36 C.F.R. pt. 212, 251, 261, and 295).

Subpart B of the Travel Management Rule requires each national forest to

designate the areas and trails where off-road vehicle use is permitted and prohibits

all use not in accordance with those designations.  36 C.F.R. §§ 212.50(a),

212.51(a), 261.13.  It establishes procedures the national forests must follow in

making designations, such as allowing public comment and coordinating with state

and tribal governments. *Id.* §§ 212.52, 212.53.  It also codifies the minimization

criteria from Executive Order 11644, requiring designations to minimize:

    (1)   Damage to soil, watershed, vegetation, and other forest resources;
    (2)   Harassment  of  wildlife  and  significant  disruption  of  wildlife

habitats;

    (3)  Conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands; and

    (4)  Conflicts among different classes of motor vehicle uses of National Forest System lands or neighboring Federal lands.

*Id.* § 212.55(b). Finally, it requires national forests to identify designations on a "motor vehicle use map" and to monitor the effects of vehicle use on public land. *Id.* §§ 212.56, 212.57.

In 2013, an environmental group challenged the Travel Management Rule's treatment of over-snow vehicles in the District of Idaho, arguing the exemption violated Executive Order 11644. *See Winter Wildlands All.*, 2013 WL 1319598, at *1. The court agreed, reasoning that Executive Order 11644 requires the Forest Service to make designations for all off-road vehicle use, including over-snow vehicle use. *Id.* at *10–12. The court ordered the Forest Service to issue a new rule consistent with Executive Order 11644. *Id.* at *14.

In 2015, the Forest Service issued the Over-Snow Vehicle Rule, amending Subpart C of the Travel Management Rule. 80 Fed. Reg. 4500 (Jan. 28, 2015) (codified at 36 C.F.R. §§ 212.80, 212.81). The rule requires national forests that receive enough snow to designate areas and trails for over-snow vehicle use in accordance with the requirements of Subpart B of the Travel Management Rule. 36 C.F.R. §§ 212.80(a), 212.81. However, the Rule included a grandfather provision, allowing national forests that had previously designated over-snow

56

vehicle routes to maintain those designations without further action. *Id.* at §§ 212.80(b), 212.81(b).

### C.    Plaintiffs' Claim

According to Plaintiffs, the Forest Service's interpretation of subpart C of the Travel Management Rule is improper for two reasons: (1) it conflicts with the plain language of Executive Order 11644, and (2) it runs afoul of the intent of Subpart C, which was enacted to require designation of trails, roads, and areas on forest service land for over-snow motor vehicle use. But Plaintiffs' broad challenge to the Forest Service's interpretation of Subpart C is unpersuasive because the Forest Service's interpretation of Executive Order 11644 is reasonable, and Plaintiffs fail to identify any *specific* instances in which the Forest Service purportedly violated the Travel Management Rule.

On the first point, Plaintiffs argue that the Forest Service's adoption of the 2006 snowmobile designations "without considering whether they comply with Executive Order 11644 or the Travel Management Rule" was arbitrary and capricious. (Doc. 77 at 51.) Essentially, Plaintiffs argue that the Forest Service's interpretation allows the Service to sidestep compliance with the requirement from Executive Order 11644 that trail designations for off-road vehicles must meet certain minimization requirements. *See* 37 Fed. Reg. 2,877 at § 3. In so arguing, Plaintiffs ignore the plain language of Subpart C, which specifically allows the

Forest Service to rely on previous over-snow vehicle designations so long as those designations were made with the proper authority and included public input. 50 C.F.R. § 212.18(b). In short, Subpart C assumes the legitimacy of previous over-snow vehicle designations that were made with the proper authority and that involved public input; therefore, the Forest Service's decision to incorporate the designations from Amendment 24—which considered minimization criteria, *see* FS-111686–936, and involved public input, FS-046501—was consistent with the language of Subpart C.

More importantly, Plaintiffs cannot identify a specific instance in which the Service violated the Order's requirement not to adopt over-snow vehicle route designations without considering minimization requirements. In the ROD, the Forest Service explained that the "programmatic plan decision does not authorize additional motor vehicle use, or prohibit existing motor vehicle uses," and so existing maps demonstrating motorized vehicle use are unchanged. FS-054761. Therefore, Federal Defendants are correct that "Subpart C does not apply," *see* FS-045677, because there have been no programmatic determinations at this stage. However, to the extent concerns remain about the Service's interpretation of Subpart C, Plaintiffs may raise those concerns in the future if specific route designations are made. In that event, Federal Defendants will have to comply with Subpart C's requirement to consider minimization criteria for new designations.

## IV. Remedy

Vacatur is the presumed remedy where an agency has acted unlawfully. *All.
for the Wild Rockies v. Savage*, 907 F.3d 1105, 1121 (9th Cir. 2018). But, when
equity so requires, underlying agency action may be "left in place while the agency
reconsiders or replaces the action, or to give the agency time to follow the
necessary procedures." *Id.* (citing *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040,
1053 n.7 (9th Cir. 2010)). "In determining the appropriate remedy, the Court must
weigh the seriousness of the agency's errors against the disruptive consequences of
vacatur." *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1155–56 (D.
Mont. 2019) (internal quotations and citation omitted) (*Savage II*). "Put
differently, courts may decline to vacate agency decisions when vacatur would
cause serious and irremediable harms that significantly outweigh the magnitude of
the agency's error." *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 468 F.
Supp. 3d 1148, 1150 (D. Alaska 2020) (internal quotation marks omitted). For
example, where an agency's error "is limited in scope and severity, and vacatur
would result in a disproportionate disruption to the Project," remand without
vacatur may be warranted. *Savage II*, 375 F. Supp. 3d at 1156. The circumstances
here support remand without vacatur.

### A. Seriousness of the Errors

In assessing the seriousness of the error, the Court "consider[s] whether

59

vacating a faulty rule could result in possible environmental harm." *Pollinator Stewardship Council v. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015). Another consideration is "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Id.* Additionally, the Court considers whether the errors are "limited in scope." *Savage II*, 375 F. Supp. 3d at 1156. In this case, the first and third considerations indicate that the harm here is not so serious as to tip the scales in favor of remand, but the second consideration is, admittedly, a closer call.

First, the parties agree that the Revised Plan includes "scores of provisions unrelated to the challenged agency determinations, many of which are environmentally beneficial." (Doc. 77 at 55; *see also* Doc. 87 at 52; Doc. 91 at 50.) In the event the Revised Plan was vacated, the 1986 Flathead Forest Plan would assume its place until a new forest plan could be issued, and the parties agree that the Revised Plan is comparatively more protective than the former Forest Plan. So, though Plaintiffs argue that the components of the Revised Plan that related to grizzly bears and bull trout warrant vacatur, vacating the Revised Plan would likely result in environmental harm.

Additionally, "[w]hile it may be misleading to classify a violation of the law

60

as anything less than 'serious,' the error is certainly limited in scope" in this instance. *Savage II*, 375 F. Supp. 3d at 1156. As explained above, the record reflects that the agencies did not violate NEPA, nor did they violate the Travel Management Rule. Rather, the record supports the conclusion that Federal Defendants violated the ESA to the limited extent they failed to explain the decision to abandon Amendment 19's road reclamation requirements in light of evidence that such abandonment would pose risks to grizzly bears and bull trout populations and bull trout habitat. Federal Defendants also failed to consider the impacts of the Revised Plan on the grizzly population as a whole, failed to explain their decision to implement 2011 access conditions, and implemented a flawed grizzly bear take statement in light of the above. While these errors are not minor, they are analogous to the Forest Service's errors in *Savage II*, where the district court concluded that the agency's defective analysis concerning road-related activities within a project area "d[id] not compromise the integrity of the Project as a whole." 375 F. Supp. 3d at 1156.

However, the second consideration—whether the agency would reach a different rule on remand—does tip in favor of vacatur. Once the agency considers the impact of the Revised Plan on the grizzly bear species as a whole, as well as considers the effectiveness of road closure devices, "a different result may be reached" so that vacatur is more appropriate than remand without vacatur. *See*

*Pollinator Stewardship Council*, 806 F.3d at 532. At the same time, however, the agency is likely to reach a different result only on the handful of challenged issues identified above, and it is unlikely to reach a different result on the Revised Plan as a whole. Thus, while this factor indicates that the agencies' errors are serious, the other two considerations indicate that the harm is not so serious as to require vacatur, particularly in light of the potential disruptive consequences of vacatur.

## H. Disruptive Consequences of Vacatur

The seriousness of the error must be weighed against "the disruptive consequences of an interim change that may itself be changed." *Pollinator Stewardship Council*, 806 F.3d at 532 (quotation marks omitted). "The Project's economic impact is relevant to the question of whether to vacate on remand." *Savage II*, 375 F. Supp. 3d at 1157 (citing *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010)). The potential disruptive effects on the environment, local communities, and wildlife are also relevant considerations. *Id.*

Currently, there are six approved projects authorized by the Revised Plan, including the Taylor Hellroaring Project, the Heallroaring Basin Improvements Project, the Crystal Cedar Project, and the March Madness Blowdown Salvage Project. (Doc. 94, ¶ 5.) At oral argument, Federal Defendants represented that all of these projects are related to vegetation and field management, save for the Hellroaring Basin Improvements Project, which addresses recreation in the

Whitefish ski area.

If the Revised Plan were vacated, the economic impact on Defendant-Intervenors and on the local communities that depend on approved projects for employment could be severe. A member of Defendant-Intervenors, Weyerhaeuser-Montana, "provides about 575 important family-wage jobs to the local community with an annual payroll of over $40 million." (Doc. 63-5, ¶ 8.) Without the Revised Plan, eight projects identified by Weyerhauser-Montana could not go forward, which would detrimentally impact its business. (*Id.* ¶¶ 20–21.) This sort of significant economic and community-level impact weighs against vacatur. *See Cal. Cmtys. Against Toxics v. E.P.A.*, 688 F.3d 989, 994 (9th Cir. 2012) (deciding to remand without vacatur in part because remand would be "economically disastrous" due to negative impact on "a billion-dollar venture employing 350 workers").

Finally, the disruptive consequences on the environment and wildlife of vacatur indicate that remand *without vacatur* is appropriate. In their reply, Plaintiffs argue that vacatur is appropriate because it will return the Forest to the "status quo," which would protect the environment and wildlife because none of the new roads envisioned under the Revised Plan will be constructed. (Doc. 100 at 52.) But at oral argument, Federal Defendants emphasized that, in the event of remand without vacatur, any project under the Revised Plan would have to be

63

examined individually; if the project impacted roads, grizzly bears, or bull trout, the project would require a site-specific consultation and a biological assessment with the Fish and Wildlife Service. This sort of site-specific evaluation undercuts Plaintiffs' argument that remand without vacatur would be overly disruptive; indeed, it demonstrates that remand without vacatur in this instance would disrupt the very projects Plaintiffs are concerned about, but allow other projects unrelated to Plaintiffs' concerns to proceed.

## CONCLUSION

For the reasons set forth above, IT IS ORDERED that the parties' motions for summary judgment (Doc. 76, 86, 90) are GRANTED IN PART and DENIED IN PART. Plaintiffs' motion (Doc. 76) is GRANTED as to WildEarth's Claim II, Counts I and II, and Swan Valley's Claims I and II to the limited extent explained in this Order. The defendants' motions (Docs. 86, 90) are GRANTED in all other respects.

IT IS FURTHER ORDERED that the provisions of the 2017 BiOp that violate the ESA are REMANDED WITHOUT VACATUR to the agencies for further consideration consistent with this Opinion.

DATED this ⟨14⟩ day of June, 2021.

Donald W. Molloy, District Judge
United States District Court